CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
SEPT 20 2018
JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| CHIJIOKE KINGSLEY OFOCHE, MD, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> APOGEE MEDICAL GROUP, VIRGINIA, ) <br> P.C., and PHC-MARTINSVILLE, INC., ) <br> d/b/a SOVAH HEALTH MARTINSVILLE ) <br> (MARTINSVILLE CI), d/b/a MEMORIAL ) <br> HOSPITAL OF MARTINSVILLE AND ) <br> HENRY COUNTY, ) <br> ) <br> Defendants. ) | Case No. 4:18cv00006 <br><br> **MEMORANDUM OPINION** <br><br> By: Hon. Jackson L. Kiser <br>       Senior United States District Court |

This matter is before the Court for consideration of three motions to dismiss: one filed by Defendant Apogee Medical Group, Virginia, P.C. (hereinafter "Apogee") [ECF No. 7], one filed by Defendant PHC-Martinsville, Inc. (hereinafter "PHC-Martinsville" or "Martinsville Memorial") [ECF No. 19], and one filed by Plaintiff [ECF No. 32]. The motions filed by Defendants were fully briefed by the parties and I heard oral arguments on the motions on August 2, 2018; Plaintiff's motion to dismiss was submitted on brief only. I have reviewed the pleadings and arguments of the parties, and the matter is now ripe for disposition. For the reasons stated herein, the motions will be granted. Plaintiff will have fourteen (14) days to file an amended complaint, if he so chooses.

I. **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**[1]

Plaintiff Chijioke Kingsley Ofoche, M.D., is a medical doctor who hails from Nigeria. (Compl. ¶ 8 [ECF No. 1].) Plaintiff was hired by Apogee in January of 2016 to work as a

---

[1] The facts are taken from Plaintiff's Complaint. As this stage, it is appropriate to accept Plaintiff's factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

hospitalist at PHC-Martinsville.[2] (Id. ¶ 11.) As a citizen of Nigeria, Plaintiff maintains an H-1B nonimmigrant visa, which permits him to work in the United States for a temporary period, and is only available to those who work in a specialty occupation. (Id. ¶ 12.) In his role as a hospitalist, Plaintiff contends he performed his job in such a manner as to exceed his employer's legitimate business expectations. (Id. ¶ 13.)

During his employment at PHC-Martinsville,[3] Plaintiff often worked the night shift as the only hospitalist in the hospital. Soon after starting, he was dismayed to learn that, as the only hospitalist on premises during the night shift, "he was consistently required to provide care to an excessive and unsafe number of patients." (Id. ¶ 16.) In total, it was not uncommon for Plaintiff to be responsible for 60–75 patients during a given shift, as well as new hospital admissions. (Id. ¶¶ 17–18.) According to Plaintiff, this patient load "was four (4) times as high as the normal industry standards." (Id. ¶ 19.)

When Plaintiff complained to his superiors at Apogee, he was routinely rebuffed or told to "get used to" the working environment. (Id. ¶ 21.) Plaintiff also contends he was threatened that, if he continued to complaint, "Apogee would not proceed with filing the requisite immigration paperwork related to his Green Card status." (Id. ¶¶ 21b, f.)

After his complaints, Plaintiff asserts he was retaliated against when his requests for a vacation to prepare for his American Board of Internal Medication exam were "initially and inexplicably ignored and denied." (Id. ¶ 22–23.) Again, Plaintiff claims he was threatened by "his superiors at Apogee" that, if he pushed the issue, he would be fired. (Id. ¶ 23.)

---

[2] Apogee "contracts with physicians and hospitals to provide general physician staffing services to hospitals." (Id. ¶ 9.) PHC-Martinsville operates Martinsville Memorial Hospital in Martinsville, VA. (Id. ¶ 10.)

[3] The parties dispute whether Apogee or PHC-Martinsville was Plaintiff's employer, or whether the two were joint employers.

Over the next several months, Plaintiff continued to complain openly, and specifically complained about "the ICU staffing issue." (Id. ¶ 24c.) Apogee and PHC-Martinsville did not take any steps to address Plaintiff's concerns.

One night in June of 2017, Plaintiff was the only hospitalist in the hospital and was responsible for approximately fifty admitted patients throughout the hospital, 13 new admissions in the Emergency Department, and all ICU patients, which included one critical patient. (Id. ¶ 30.) Plaintiff was also requested to accept a new patient as a transfer from Danville, VA. (Id. ¶ 32.) Concerned about the number of patients for which he was responsible, Plaintiff alerted Dr. Doug BeMent, the Chief Financial and Compliance Officer at PHC-Martinsville, that he would not accept the new patient transfer until Apogee and PHC-Martinsville "provided additional physician support." (Id. ¶ 33.) Although the issue was eventually resolved, Plaintiff was "berated" the next day "for raising concerns about patient safety and care." (Id. ¶ 36.)

Five days later, on June 26, 2017, Dr. Johnson Gomez advised Plaintiff that he "needed to communicate more clearly." (Id. ¶ 38.) Plaintiff believes that statement was meant to indicate that Plaintiff's Nigerian accent was a hindrance in the workplace, was a veiled threat, and that Dr. Gomez was acting on the direction of his superiors at Apogee. (Id.)

That same day, Dr. Gomez presented Plaintiff was a written list of performance-related concerns. (Id. ¶ 40.) Although Plaintiff does not indicate what concerns were listed, he asserts the so-called performance issues "had no basis in fact and were solely created by Apogee as a retaliatory tool." (Id.) At the meeting, Dr. Gomez refused to provide Plaintiff with a copy of this list. (Id.) During the meeting, however, Plaintiff alleges:

> Dr. Gomez made clear reference to [Plaintiff's] H-1B visa status, and mentioned the tenuous manner of these types of visas. Dr. Gomez also pointed out that [Plaintiff's] H-1B visa status was part of the written list of performance[-]related 'concerns.' Based upon

- 3 -

> Dr. Gomez's tone of voice and pointed irrelevant reference, [Plaintiff] interpreted this comment as a threat that Apogee and/or Martinsville Memorial planned to jeopardize [Plaintiff's] H-1B visa status.

(Id. ¶ 41.) Plaintiff thereafter advised Dr. Gomez that he was seeking legal counsel. (Id. ¶ 42.)

Plaintiff asserts that Apogee and PHC-Martinsville targeted Plaintiff because of his race and his national origin. He contends they have a policy of recruiting and hiring "minority foreign nationals under the H-1B visa program in an effort to assert more than ordinary control over those employees due to fear of retaliation and deportation." (Id. ¶ 27.) According to Plaintiff, every single hospitalist "employed by Apogee and working at Martinsville Memorial is a minority foreign national who is employed via an H-1B visa." (Id. ¶29.)

In August of 2017, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging race and national origin discrimination. He contends that the "workplace discrimination and retaliation" increased after he filed his charge. (Id. ¶ 45.) He contends he was "ostracized by his peers, supervisors, and staff, which caused [Plaintiff] extreme anxiety and emotional distress due to concerns of Defendants derailing his immigration status and causing his deportation." (Id. ¶ 46.)

In December of 2017, in the context of receiving a request for employment verification, Plaintiff asserts that Apogee again threatened Plaintiff that he was in jeopardy of losing his H-1B visa. (Id. ¶ 47.)

As a result of the "untenable and unsafe" working environment, Plaintiff contends he was constructively discharged from his employment on January 5, 2018. (Id. ¶ 48.) His last day at PHC-Martinsville was January 22. Between the time of his alleged constructive discharge and the cessation of his services at the hospital, Plaintiff contends he was further retaliated against "in the form of further decreased staffing," which Plaintiff maintains was purposeful. (Id. ¶ 49.)

Plaintiff filed suit in this Court on January 26, 2018 (Compl., Jan. 26, 2018 [ECF No. 1]), alleging: race discrimination under Title VII (Count 1); race retaliation under Title VII (Count 2); national origin discrimination under Title VII (Count 3); national origin retaliation under Title VII (Count 4); Title VII hostile work environment (Count 5); 42 U.S.C. § 1981 race discrimination (Count 6); 42 U.S.C. § 1981 race retaliation (Count 7); 42 U.S.C. § 1981 hostile work environment (Count 8); breach of contract by Apogee (Count 9); and fraud in the inducement by Apogee (Count 10). Apogee filed a self-styled counterclaim requesting attorneys' fees, pursuant to its employment agreement with Plaintiff, if it prevails in this action. [ECF No. 30.]

## II. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In determining facial plausibility, the court must accept all factual allegations in the complaint as true. Id. The Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555 (internal quotation marks omitted). Therefore, the Complaint must "allege facts sufficient to state all the elements of [the] claim." Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003). Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations," a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

## III. DISCUSSION

A. Plaintiff's Claims of Race and National Origin Discrimination

The gravamen of Plaintiff's complaint is his assertion, through various theories of recovery, that he was subject to race and national origin discrimination in violation of Title VII and § 1981. Title VII makes it "an unlawful employment practice . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under both Title VII and § 1981, in order to succeed on his discrimination claims, Plaintiff must demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010); see also Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) (evaluating a § 1981 racial discrimination claim and a Title VII racial discrimination claim under the same prima facie framework).

Nothing in Plaintiff's Complaint, however, makes the leap from the actions complained of to discrimination "on the basis of" race or national origin. Rather, his allegations establish discrimination, if at all, on the basis of his immigration status. By his own admission, *every* hospitalist at Martinsville Memorial is an immigrant in the United States by virtue of an H-1B visa. (See Compl. ¶ 29.) He alleges, "Defendants have an unwritten policy/practice to recruit foreign nationals under the H-1B visa program in an effort to assert more than ordinary control over those employees due to fear of retaliation and deportation." (Id. ¶ 26.) On virtually every

occasion recounted by Plaintiff, it was his *immigration status* that an agent of Apogee expressly mentioned and threatened. (See id. ¶¶ 21b, 21f, 23, 28, 37, 41, 47.) He points out that *every* hospitalist is subject to the same unsafe and unfair conditions and, though he does not allege the race or national origin of every hospitalist, he does include their names and pictures. (Id. ¶ 29.) A fair reading of the Complaint suggests that not every hospitalist is black (as Plaintiff is), and not every hospitalist is of Nigerian descent (as Plaintiff is). At best, Plaintiff alleges that Defendants discriminate against *H-1B visa holders*, without regard to their race or national origin. Based on his allegations, the discrimination of which Plaintiff complains is forced upon white, black, Asian, or Hispanic individuals, so long as the hospitalist is present in the county on an H-1B visa.

Unfortunately for Plaintiff, the discrimination he has complained of is not covered under Title VII or § 1981.[4] "Discrimination based on one's status as an immigrant might have been included within the ambit of 'national origin' discrimination, but that is not the path the Supreme Court has taken. The Court instead chose almost [45] years ago to adopt a narrower definition of national origin discrimination for purposes of Title VII." Cortezano v. Salin Bank & Trust Co., 680 F.3d 936, 940 (7th Cir. 2012) (citing Espinoza v. Farah Mfg. Co., 414 U.S. 86 (1973)). In Espinoza, the Supreme Court concluded that the phrase "national origin" in Title VII referred to "the country from which you or your forbears came." Espinoza, 414 U.S. at 89. "Thus, national origin discrimination as defined in Title VII encompasses discrimination based on one's ancestry, but not discrimination based on . . . immigration status." Cortezano, 680 F.3d at 940.

Congress "took steps to limit Espinoza's holding when it enacted 8 U.S.C. § 1324b in 1996." Id. That statute states, in relevant part, that "[i]t is an unfair immigration-related

---

[4] Plaintiff makes the conclusory statement that the discrimination was because of his race and national origin, but the facts do not support that conclusion. Though I am bound to accept Plaintiff's factual allegations, his legal conclusions are not entitled to any such deference.

employment practice for a person or other entity to discriminate against any individual . . . with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment . . . in the case of a protected individual (as defined in paragraph (3)), because of such individual's citizenship status." 8 U.S.C. § 1324b(a)(1)(B) (2018). But Plaintiff has not pursued his remedies under that statute. By electing to proceed under Title VII and § 1981, his claim is not recognized.

In an attempt to avoid this result, Plaintiff maintains that his immigration status is a stand-in for his race and national origin. But aside from his own desire to shoehorn his allegations into Title VII and § 1981, nothing in his Complaint supports that claim. *Every* hospitalist has an H-1B visa, and *every* hospitalist is subject to the same "unsafe" and "untenable" working conditions. The only thing Plaintiff has alleged all hospitalists have in common is their immigration status. They are of different races and nationalities, making his claim that immigration status is a stand-in for race and national origin implausible on the facts alleged. "[A]lthough [Plaintiff's] complaint conclusorily alleges that [Plaintiff] was terminated based on his race [and national origin], it does not assert facts establishing the plausibility of that allegation." Coleman, 626 F.3d at 190–91.

To be sure, there are situations in which discrimination on the basis of immigration status *is* discrimination on the basis of race or national origin. "In some instances, for example, a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination. In other cases, an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination. . . . It is equally clear, however, that these principles lend no support to [Plaintiff's] case." Espinoza, 414 U.S. at 92. Nothing in the Complaint suggests that a white or French medical doctor, who also possesses an H-1B visa,

would not be subject to the same "unsafe" and "untenable" working environment as Plaintiff. Without something on which to base the conclusion that Plaintiff's race and national origin were the actual bases for discriminatory conduct, Plaintiff has failed to plausibly allege a claim under Title VII or § 1981.

Moreover, even if Plaintiff *had* connected his immigration status to his race and national origin, he has failed to allege an adverse employment action by Defendants. His Complaint, read fairly, indicates that the "terms and conditions" of his employment never changed during his tenure at PHC-Martinsville. Maintenance of the status quo, however unsafe Plaintiff feels that it is, is not a materially adverse change to "terms and conditions" of his employment. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (stating that Title VII liability can arise from a "tangible employment action," which includes not only "hiring, firing, failing to promote, . . . [and] significant change in benefits," but also "reassignment with significantly different responsibilities"); Boone v. Goldin, 178 F.3d 253, 255–56 (4th Cir. 1999) (stating that "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" were typical types of "'adverse employment action'" that can support a Title VII claim"); Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (stating that inquiries into adverse employment actions have consistently focused on whether there has been discrimination in such ultimate decisions as hiring, granting leave, discharging, promoting, and compensation). Plaintiff's allegation that, from the very start, he was forced to work understaffed does not implicate a change in the "terms and conditions" of Plaintiff's employment; continuation of the status quo is no change. Accord Grassel v. Dep't of Educ. Of City of New York, No. 12CV1016, 2015 WL 5657343, at *8–9 (E.D.N.Y. Sept. 24, 2015) (holding that a "continuation of the status quo" was not actionable under the ADA); Ferrell v.

Babcock & Wilcox, Co., No. 6:12-cv-00048, 2013 WL 4463316, at *4 (W.D. Va. Aug. 19, 2013) (holding that an action that "simply maintains the status quo" is not an adverse employment action under the ADEA); Del Castillo v. Wash. Dep't of Soc. & Health Servs., No. C05-1122JLR, 2007 WL 2713035, at *8 (W.D. Wash. Sept. 14, 2007) (noting that "a continuation of the status quo" was not an adverse employment action); Pinero v. Long Island State Veterans Home, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) (dismissing action for lack of an adverse employment action where the action at issue "kept the status quo in place").

In sum, because the allegations do not plausibly establish discrimination on the basis of race or national origin, Counts I (Title VII race discrimination), III (Title VII national origin discrimination), V (Title VII hostile work environment), VI (§ 1981 race discrimination), and VIII (§ 1981 hostile work environment) will be dismissed with leave to amend.

    B.  <u>Plaintiff's Claims of Race and National Origin Retaliation</u>

"The elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). "It is well-settled that the elements that plaintiffs must satisfy to state a prima facie case of retaliation under § 1981 equal the elements of a prima facie case of retaliation under Title VII." Jenkins v. Gaylord Entm't Co., 840 F. Supp. 2d 873, 880 (D. Md. 2012).

"Protected activities fall into two distinct categories: participation or opposition. An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1996) (citing 42 U.S.C. § 2000e-3(a)

(1994)). "Activities that constitute participation are outlined in the statute: (1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." Id. (citing 42 U.S.C. § 2000e-3(a)). "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Id.

The requirement of an adverse employment action for a retaliation claim is not as stringent as one for a discrimination claim. In Burlington Northern & Santa Fe Railway Co. v. White, the Supreme Court held that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harms." 548 U.S. 53, 67 (2006). Therefore, a plaintiff need not establish an 'adverse employment action' as that term is used in the context of the anti-discrimination provision to satisfy the second prong of the prima facie case for a claim based on the anti-retaliation provision. Id. Rather, a plaintiff need only "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68.

Plaintiff asserts that filing a charge with the EEOC, a protected activity, led to the adverse employment action—his constructive termination. His Complaint is deficient, however, because he does not allege any awareness of his EEOC charge by his superiors at Apogee or PHC-Martinsville. See Creque v. Fox NC Acquisition LLC, No. 5:13-cv-727, 2014 WL 773633, at *3 (E.D.N.C. Feb. 25, 2014). He asserts only that a charge was filed, not that any of the actors at Apogee or PHC-Martinsville *knew* of the charge. "[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998);

see also Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 901 (4th Cir. 2017) ("If an employer . . . never realized that its employee engaged in protected conduct, it stands to reason that the employer did not act out of a desire to retaliate for conduct of which the employer was not aware."). Thus, Plaintiff has not alleged a causal link between his charge and his alleged constructive termination.

Plaintiff also alleges that, after filing his complaint with the EEOC, he was "ostracized by his peers, supervisors, and staff, which caused [him] extreme anxiety and emotional distress . . . ." (Compl. ¶ 46.) Even assuming anyone at Apogee or PHC-Martinsville knew about his filing, feelings of ostracization "do not meet the retaliation standard of being materially adverse." McKinney v. G4S Government Solutions, Inc., 711 F. App'x 130, 137–38 (4th Cir. 2017) (unpublished); see also Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 189 (4th Cir. 2004) (finding no adverse employment action from victim "being excluded from certain meetings and emails," receiving "negative employment evaluation," and being "ostracized by certain employees"); Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 271–72 (4th Cir. 2001) ("[U]ncivility of co-workers" is insufficient to establish adverse employment action, particularly where there is no allegation "that [the company] instructed . . . co-workers to ostracize" the plaintiff.).

Plaintiff is left, then, with his complaints to his superiors at Apogee and PHC-Martinsville. "To determine whether an employee has engaged in legitimate opposition activity, [courts] employ a balancing test. [They] 'balance the purpose of [Title VII] to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of

personnel.'" Laughlin, 149 F.3d at 259–60 (quoting Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981)).

To qualify as protected activity, the employment practices opposed may be either "'actually unlawful under Title VII'" or "'employment actions [the employee] reasonably believes to be unlawful.'" Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005)). An employee's complaints, however, must communicate "a belief that the employer has engaged in . . . a form of discrimination" based on a protected class. Crawford v. Metro. Gov't of Nashville & Davidson City, 555 U.S. 271, 276 (2006).

Plaintiff alleges two types of complaints: complaints about the staffing and patient care, and a claim that he advised his superiors "that he planned to seek legal counsel based upon this clear retaliation related to his race and national origin." (Compl. ¶ 42.) Neither qualifies as a protected activity. First, complaints about patient care are not opposition to activity that is "actually unlawful under Title VII." Insofar as Plaintiff complained about the manner in which Apogee or PHC-Martinsville staffed the hospital, it is not protected by Title VII.[5] Second, for the reasons stated previously, his complaint about "retaliation" was not in opposition to discrimination *outlawed by Title VII*. A fair reading of his allegations establishes that the only discrimination, if any, that occurred was discrimination against Plaintiff based on his immigration status. Because that is not outlawed by Title VII, retaliation for complaints about that discrimination is not actionable under Title VII.

Because Plaintiff has not adequately alleged a causal link between a protected activity and an adverse employment action, he has failed to state a claim for retaliation under either Title

---

[5] Plaintiff makes the argument that the culture of "indentured servitude" at PHC-Martinsville transforms any complaints about the workplace into complaints about the discrimination that occurs there. Not surprisingly, he fails to cite a single case in support of this novel legal theory.

VII or § 1981. Accordingly, Counts II (Title VII race retaliation), IV (Title VII national origin retaliation), and VII (§ 1981 race retaliation) will be dismissed with leave to amend.

C. Counts IX (breach of contract by Apogee), X (fraud in the inducement by Apogee), and Apogee's Counterclaim (breach of contract)

Plaintiff's remaining counts, and Apogee's self-styled counterclaim,[6] are based on state contract law. Because all of the claims over which this court has original jurisdiction will be dismissed, I decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3). Additionally, because there are independent grounds to dismiss all the claims against Apogee, Apogee's arguments regarding the "joint employer" doctrine will not be addressed. If Plaintiff chooses to file an amended complaint, he would be well advised to include facts relevant to his alleged joint employment in his pleadings, not in his briefings in opposition to a motion to dismiss.

IV. **CONCLUSION**

A fair reading of Plaintiff's allegations establishes, at most, discrimination on the basis of his immigration status. Such discrimination is not outlawed by the statues under which he brings this action. His allegations do not plausibly allege discrimination on the basis of his race or national origin. Accordingly, his Complaint will be dismissed for failure to state a claim. I decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and Apogee's state law counterclaim, so they will be dismissed for lack of jurisdiction. Plaintiff will, however, be given fourteen (14) days to file an Amended Complaint, if he so chooses.

---

[6] Apogee uses a counterclaim, which I interpret as alleging a breach of contract, to make a request for attorneys' fees if it prevails in this action. I do not believe that to be a proper vehicle by which to request attorneys' fees in this action. See Fed. R. Civ. P. 54(d)(2)(A).

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 20th day of September, 2018.

                                              s/Jackson L. Kiser  
                                              SENIOR UNITED STATES DISTRICT JUDGE