CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

OCT 4 2018

JULIA C. DUDLEY, CLERK
BY:  s/ MARTHA L. HUPP
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## DANVILLE DIVISION

**CHIJIOKE KINGSLEY OFOCHE, MD,**

     **Plaintiff,**

**v.**                                **Case No. 4:18-CV-006**

**APOGEE MEDICAL GROUP,**
**VIRGINIA, P.C.,**                     **JURY TRIAL DEMAND**

**and**

**PHC-MARTINSVILLE, INC.,**
**d/b/a SOVAH HEALTH**
**MARTINSVILLE (MARTINSVILLE**
**CI) d/b/a MEMORIAL HOSPITAL OF**
**MARTINSVILLE AND HENRY**
**COUNTY,**

     **Defendants.**

### FIRST AMENDED COMPLAINT

The above-named Plaintiff, Chijioke Kingsley Ofoche, MD (hereinafter, "Dr. Ofoche" or "Plaintiff"), by counsel, states as his First Amended Complaint against Defendant Apogee Medical Group, Virginia, P.C., (hereinafter, "Apogee"), and Defendant PHC-Martinsville, Inc. d/b/a Sovah Health Martinsville (Martinsville CI) d/b/a Memorial Hospital of Martinsville and Henry County (hereinafter, "Martinsville Memorial") (collectively, "Defendants"), the following:

# I. INTRODUCTION

1. Dr. Ofoche brings this action under Title VII of the Civil Rights Act of 1964, as codified under 42 U.S.C. §§ 2000e, *et seq.*, 42 U.S.C. § 2000e-5(f) ("Title VII"), and the Civil Rights Act of 1991, as amended, as codified under 42 U.S.C. § 1981, *et seq.* ("Section 1981"),  in order to remedy the racial and national origin discrimination he suffered during his employment with Apogee and Martinsville Memorial.

2. Apogee's business model is to provide physicians to staff Martinsville Hospital and other hospitals, much like temp agencies provide staffing needs for companies.

3. While working at Martinsville Memorial as a Medical Doctor | Hospitalist, Dr. Ofoche was indistinguishable from physicians employed directly by Martinsville Memorial (other than his poor treatment based upon his race and national origin).

4. Upon information and belief, Apogee and Martinsville Memorial held an animus towards Hospitalists in their employ who possessed a national origin other than the United States of America and who were of color.

5. Dr. Ofoche and other Hospitalists suffered discrimination and retaliation based on their race, as their racial and national origin characteristics made them targets for discrimination and retaliation by Apogee and Martinsville Memorial.

6. Apogee and Martinsville Memorial, using Dr. Ofoche's and other Hospitalists' non-United States national origin to their advantage, created a work environment akin to "modern indentured servitude" whereby these Hospitalists were required to work grueling hours with unsafe patient loads.  If the Hospitalists protested this working environment, they were retaliated against or threatened by Apogee and Martinsville

2

Memorial based upon their visa status.

7.  Apogee and Martinsville Memorial leveraged Dr. Ofoche's national origin, in particular, using his work visa status as a proxy only, rather than the basis of discrimination and retaliation, to discriminate and retaliate against Dr. Ofoche after he made complaints about an unsafe working environment for physicians and patients alike, created due to the dangerous number of patients for which he was required to provide care.

8.  Ultimately, Dr. Ofoche was constructively discharged from employment for making complaints about his working environment and the discrimination and retaliation he experienced.

## II. JURISDICTION

9.  This Court has jurisdiction over this matter as it arises from the federal questions presented by Title VII and Section 1981. *See generally* 28 U.S.C. §§ 1331, 1343(a)(4).

10. At all times relevant to this action, Plaintiff Dr. Ofoche was a resident of the City of Martinsville, located within the Commonwealth of Virginia.

11. Defendant Apogee is incorporated and does business within the Commonwealth of Virginia.  Therefore, due to its contacts within the Commonwealth, Apogee avails itself to the jurisdiction of this Court.

12. Defendant Martinsville Memorial is incorporated and does business within the Commonwealth of Virginia.  Therefore, due to its contacts within the Commonwealth, Martinsville Memorial avails itself to the jurisdiction of this Court.

13. Venue is appropriate as the acts and/or omissions of Defendants from which these causes of action arise, occurred in Martinsville, Virginia, within the Western District of Virginia, Danville Division.  *See* 28 U.S.C. § 1391(b)(2).

14. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in August of 2017. Plaintiff received a Dismissal and Notice of Rights from the EEOC, dated November 1, 2017, previously attached to his original Complaint. Plaintiff filed suit within ninety (90) days of receipt of the initial November 1, 2017 Dismissal and Notice of Rights.

### III. THE PARTIES

15. Dr. Ofoche is a current resident of Maryland.  Dr. Ofoche identifies his race as African/Black and his national origin as Nigerian.

16. Defendant Apogee is an affiliate of Apogee Medical Group, Inc. (d/b/a Apogee Physicians), which operates hospitals in the United States, India, and the United Arab Emirates.  Apogee contracts with physicians and hospitals to provide general physician staffing services to hospitals.

17. Defendant Martinsville Memorial operates the hospital known as Martinsville Memorial Hospital, located at 320 Hospital Drive, Martinsville, VA  24115.

### IV.  FACTUAL ALLEGATIONS

18. Dr. Ofoche was hired by Apogee in or about January of 2016, to work as a Medical Doctor | Hospitalist at Martinsville Memorial Hospital.  Prior to his constructive discharge, Dr. Ofoche earned an annual salary of approximately $280,000 and was offered health, vision, and dental insurance, and quarterly bonus

opportunities.

### Dr. Ofoche's H-1B Visa Classification
### Used As A Proxy For National Origin And Race Discrimination

19. Dr. Ofoche is a citizen of Nigeria, has a national origin of Nigeria, and identifies his race as African/Black.

20. Further, Dr. Ofoche maintains an H-1B nonimmigrant visa *because of his national origin, Nigeria.* The H-1B visa classification permits a foreign national to work in the United States for a temporary period, is available only to those who are in a specialty occupation, and is only available to those individuals who are currently employed.

21. Upon information and belief, any reference by Defendants to Dr. Ofoche's visa or immigration status was a thinly veiled discriminatory reference to Dr. Ofoche's national origin and race.

22. At all times relevant, Dr. Ofoche's work performance was excellent and surpassed Apogee's and Martinsville Memorial's legitimate business expectations.

### Martinsville Memorial Was Dr. Ofoche's Joint Employer

23. Because Martinsville Memorial has indicated in prior briefings that it was not Dr. Ofoche's employer, this Amended Complaint shall address this issue in more detail.

24. Dr. Ofoche was jointly employed by Apogee and Martinsville Memorial. An entity may be liable as an employer even if the purported employee does not directly receive their paychecks from that entity. The joint employment doctrine, articulated in *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 414 (4th Cir. 2015), was

extended to employers for liability under Title VII. The Fourth Circuit specifically developed this test so that employers who receive workers from employment staffing agencies cannot escape liability under Title VII "by hiding behind another entity." *Id.* at 415.

25. To assert a claim under the joint employer doctrine, a plaintiff must satisfy the *Butler* factors by alleging facts sufficient to show that the joint employer had the authority to control his employment. Factors the Court are to consider include the following:   (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.  *Id.* at 414.

26. In this matter, Dr. Ofoche contends that factors (1), (2), (3), (5), (6), (8), and (9) all weigh in his favor as Martinsville Memorial had a more than *de minimus* influence in Dr. Ofoche's hiring and firing, had day-to-day supervisory authority and ability to mete out employee discipline, provided the equipment used and the sole place of work, provided training to Dr. Ofoche, and was Dr. Ofoche's sole employer and worksite for

over a year.

27. Dr. Ofoche's placement at Martinsville Memorial was not the sole discretion of Apogee. Rather, Martinsville Memorial interviewed and chose Dr. Ofoche as an employee. Indeed, while Dr. Ofoche was applying for the position of Hospitalist, on or about April 2, 2015, Dr. Ofoche interviewed with Martinsville Memorial CEO Michael Ehrat and Director of Physician Recruitment Carole McGovern.

28. Upon information and belief, this interview was integral for Dr. Ofoche to be hired as a Hospitalist by Apogee for exclusive placement at Martinsville Memorial and for Dr. Ofoche being offered retention bonuses of $5,000. This bonus, at the root, was paid directly by Martinsville Memorial but was filtered through the Apogee entity. Upon information and belief, Martinsville Memorial had the final decision regarding the hiring of Dr. Ofoche for placement at their hospital and, accordingly, certainly intended to enter into an employer/employee relationship with Dr. Ofoche.

29. During Dr. Ofoche's employment, patients regularly believed that Dr. Ofoche was employed by Martinsville Memorial. Indeed, Dr. Ofoche's job duties of providing patient care were identical to other physicians directly employed by Martinsville Memorial.

30. Martinsville Memorial provided many of the instrumentalities of Dr. Ofoche's day-to-day practice, including necessary medical equipment (computers, pagers, electronic medical records, medical transcription services etc.), staff members, and meals.

31. Further, Martinsville Memorial maintained day-to-day control over Dr.

Ofoche's schedule, job duties, and his patient load.

32. As an example, in addition to providing care to his patients in the Martinsville Memorial ICU, Dr. Ofoche provided consultations to Martinsville Memorial's Emergency Department ("ER"). Dr. Ofoche was also required to report any hospital admissions and other issues to Martinsville Memorial's on-call Hospital Administrator and Doug BeMent, Martinsville Memorial Chief Financial and Compliance Officer.

33. Martinsville Memorial directed Dr. Ofoche in how to admit and treat patients in the ER and Intensive Care Unit ("ICU"), and maintained disciplinary authority related to employed physicians.  As a discrete example, on or around October 24, 2017, Dr. Ofoche was directed by Martinsville Memorial's on-call administrator to treat a patient in the ER that had been given vasopressors to sustain the patient's blood pressure. Upon information and belief, vasopressors are generally given in an ICU setting.  Upon information and belief, had Dr. Ofoche refused to treat the patient in the ER and strongly insisted on transfer to the ICU, Martinsville Memorial would have insisted that Apogee punish and/or terminate Dr. Ofoche.   Indeed, this outcome was threatened so Dr. Ofoche conceded in this instance and in many others.

34. Indeed, as it relates to the ability to discipline, as detailed throughout this Amended Complaint, Dr. Ofoche was threatened with retaliation and discipline, in the form of losing his visa status and employment, by Martinsville Memorial as well as Apogee supervisory employees.  Martinsville Memorial employees held themselves out to Dr. Ofoche as having the authority to facilitate disciplinary actions against him and, on several occasions, directly requested that Apogee discipline Dr. Ofoche.

8

35. Martinsville Memorial regularly offered and furnished training to Dr. Ofoche, such as information technology ("IT") training and Quality Improvement Training.

36. Martinsville Memorial also offered Dr. Ofoche a seat on a Martinsville Memorial advisory panel.

37. Martinsville Memorial frequently sent all physicians working in the hospital, including Dr. Ofoche, "physician satisfaction surveys" on how best to improve the facilities and patient continuity of care, among other topics.

38. Additionally, Martinsville Memorial's Chief Medical Officer repeatedly emailed Dr. Ofoche directing him to fill out an evaluation for a non-Apogee affiliated cardiologist.

39. Finally, Martinsville Memorial Hospital, located at 320 Hospital Drive, Martinsville, VA  24115 was Dr. Ofoche's sole worksite during the entirety of his employment.

## Patient Safety Concerns And Dr. Ofoche's Initial Complaints

40. Dr. Ofoche worked grueling hours and routinely worked twelve (12) hour shifts for a seven (7) day period, followed by seven (7) days off from work.   Dr. Ofoche was most often assigned to work the night shift and was typically the only Hospitalist on site during his shift.

41. As the lone Hospitalist during his shift, Dr. Ofoche was responsible for all currently admitted and newly admitted patients at Martinsville Memorial Hospital.

42. Immediately after Dr. Ofoche's hire in January of 2016, he was dismayed to realize that he was consistently required to provide care to an excessive and unsafe

number of patients.  The number of patients assigned to Dr. Ofoche often far exceeded the number of patients for which he could provide adequate, safe care at any given time.

43. As an example, on the night shift, Dr. Ofoche was generally responsible for a sixteen (16)-bed open ICU.  Upon information and belief, the care of these ICU patients equates to a full-time position.

44. However, in addition to the ICU patients, Dr. Ofoche also was responsible for, on average, six (6) to fifteen (15) new hospital admissions, and for the care of fifty (50) to sixty (60) currently admitted patients located throughout the Martinsville Memorial facility.

45. Upon information and belief, relevant industry standards and policies supported by the Society of Hospital Medicine, American Board of Internal Medicine, The Joint Commission (formerly The Joint Commission on Accreditation of Healthcare Organizations ("JCAHO")), and the Virginia Board of Medicine discourage such high-volume staffing practices.

46. Apogee Program Director Dr. Johnson Gomez – Dr. Ofoche's direct supervisor – initially agreed with Dr. Ofoche that the lack of support and number of patients led to an unsafe environment.  However, Dr. Gomez changed his opinion and position on this point after speaking with Apogee administrators.

47. Indeed, upon information and belief, Dr. Ofoche was required to manage a patient-load that was four (4) times as high as the normal industry standards.

48. Dr. Ofoche articulated his concerns related to the high volume of patients for

10

which he was responsible and related patient safety issues to a myriad of supervisors at both Apogee and Martinsville Memorial on numerous occasions throughout his employment. On most occasions, these supervisors threatened Dr. Ofoche by commenting on Dr. Ofoche's national origin and referencing his precarious visa status.

49. A bird's eye view of many of these conversations follow[1]:

   a.   On or about February 18, 2016, Dr. Ofoche engaged in a telephone conference with Amy Maverick, MD, Apogee Chief Compliance Officer. Dr. Maverick ignored Dr. Ofoche's concerns.

   b.   On or about February 22, 2016, Dr. Ofoche had a personal discussion with Tooba Kazmi, MD, Apogee Program Director, who was named as the Martinsville Memorial Chief Medical Officer in June of 2016. Dr. Kazmi advised Dr. Ofoche that he should "get used to" his work environment and not complain further. Dr. Kazmi also pointedly reminded Dr. Ofoche that he was employed via an H1-B visa and that he if "continue[d] to complain," Apogee would not proceed with filing the requisite immigration paperwork related to his Green Card status.

   c.   Also, on or about February 22, 2016, Dr. Ofoche engaged in a telephone conference with Lawrence Young, MD, Apogee Director of Clinical Operations. Dr. Young ignored Dr. Ofoche's concerns.

   d.   In or about March of 2016, Dr. Ofoche engaged in a telephone conference

---

[1] Most of Dr. Ofoche's complaints were made verbally as he was specifically directed by Dr. Kazmi early on during his employment not to "send emails" so there would not be a "paper trail".

with Michael Marvinny, DO, an Apogee Regional Director. Dr. Marvinny ignored Dr. Ofoche's concerns.

e.  In or about March of 2016, Dr. Ofoche again engaged in a personal discussion with Dr. Kazmi.  Dr. Kazmi ignored Dr. Ofoche's concerns.

f.  On or about May 17, 2016, Dr. Ofoche engaged in a personal discussion with Dr. Kazmi and Dr. Gomez.  Dr. Kazmi, again, pointedly reminded Dr. Ofoche that he was employed via an H1-B visa (because of national origin) and that if he "continue[d] to complain," Apogee would not proceed with filing the requisite Green Card paperwork.  When Dr. Ofoche advised that he planned to send an email complaint to Dr. Kazmi's supervisors, Dr. Kazmi categorically stated that, if Dr. Ofoche continued his complaints, she would "ensure" that Dr. Ofoche was "fired" and that he would never practice medicine in the United States again.

### Retaliation Against Dr. Ofoche

50. In or around July of 2016, Dr. Ofoche experienced retaliation.  Specifically, in or around April, May, and June of 2016, Dr. Ofoche attempted to schedule a vacation so he could prepare for his American Board of Internal Medicine Exam in August of 2016.

51. Dr. Ofoche's requests were initially and inexplicably ignored and denied. Moreover, Dr. Gomez advised Dr. Ofoche that if Dr. Ofoche continued to push the matter, Apogee would likely relieve Dr. Ofoche of his job, which would affect Dr. Ofoche's immigration status.

52. Dr. Gomez also proposed to Dr. Ofoche that he should push his board examination back for a year.  Upon information and belief, Dr. Gomez was receiving direction from his superiors at Apogee and was bound to comply, as Dr. Gomez also is employed under an H1-B visa and, understandably, feared for his employment status.

53. Upon information and belief, other physicians who were not individuals of color or whose national origin was that of the United States were not subject to this type of discrimination and retaliation concerning the preparation for the all- important board examination.  Upon information and belief, it was a normal practice for Defendants to give time off to physicians who needed to study for the board examination so the departure from this norm in the case of Dr. Ofoche was unusual and indicative of a discriminatory and retaliatory animus.

### Dr. Ofoche Continues to Complain

54. Although Dr. Ofoche's complaints were never appropriately addressed by Apogee or Martinsville Memorial, he again voiced his concerns related to his work environment and patient safety issues on the following occasions:

    a.  In or about November of 2016, Dr. Ofoche complained openly during a group team meeting led by Dr. Marvinny. While Dr. Ofoche made general complaints about his unsafe work environment and his treatment, of particular note, Dr. Ofoche complained about an incident that occurred on November 11, 2016.  During this incident he was forced by Martinsville Memorial to admit a highly critical and unstable patient even though there was no attending physician staffed in the ICU.  Dr. Ofoche also complained about the threats of

retaliation he received from supervisors at Martinsville Memorial if he did not agree to admit this patient.

   b.  On or about February 20, 2017, Dr. Ofoche engaged in a personal discussion with Dr. Gomez.

   c.  On or about August 28, 2017, Dr. Ofoche complained openly during a monthly group team meeting, specifically discussed the ICU staffing issue and related patient safety issues, and questioned why the Apogee Hospitalists were bearing the brunt of this concerning work environment.

55. Despite Dr. Ofoche's numerous complaints, neither Apogee nor Martinsville Memorial altered Dr. Ofoche's work environment or addressed Dr. Ofoche's legitimate patient safety concerns.

<strong>The Modern Indentured Servitude</strong>

56. Instead, upon information and belief, Defendants conspired to target and retaliate against Dr. Ofoche based upon his race (African/Black) and national origin (Nigerian).

57. Indeed, upon information and belief, Defendants have an unwritten policy/practice to recruit minority foreign nationals under the H-1B visa program in an effort to assert more than ordinary control over those employees due to fear of retaliation and deportation.  These employees are then forced to work unhealthy hours and in untenable conditions.

58. Upon information and belief, Apogee and Martinsville Memorial recruit and hire minority foreign nationals because they are "less likely to complain."

14

59. As an example, Adina Bowe, MD, also employed with Apogee under an H1-B visa, experienced clear retaliation when she made similar complaints related to understaffing and patient safety in a June 2016 email.  Dr. Bowe experienced immediate retaliation in that her immigration paperwork related to her Green Card application was, upon information and belief, purposefully withheld by Apogee.

60. Of great importance, **every single Hospitalist** employed by Apogee and working at Martinsville Memorial is a **minority/person of color** who is also a **foreign national**.  It naturally follows that all of these individuals are employed via an H1-B visa. [2]



[2] Screenshot captured from the Martinsville Memorial Hospital website:
http://www.martinsvillehospital.com/our-services/hospitalist-services

61. Specifically, Dr. Bowe's national origin, at all times relevant, was of the Bahamas and she identified her race as Black. Dr. Mohammed Fasahat's national origin was of Pakistan and he identified his race as Asian/Middle-Eastern. Dr. Michael Inniss' national origin, at all times relevant, was of Barbados and he identified his race as Black. Dr. Chaitanya Korrapat's national origin was of India and he identified his race as Asian. Dr. Harold Lim's national origin was of the Philippines and he identified his race as Asian. Dr. Precious Ramirez's national origin, at all times relevant, was of the Philippines and she identified her race as Asian. Dr. Prashanth Rawla's national origin was of India and he identified his race as Asian.

62. This striking statistical data cannot be ignored and is regularly used as evidentiary support in these types of matters.  Upon information and belief, all of these Hospitalists were, or currently are, being treated in a similar manner to that of Dr. Ofoche.  The sole linking factor of these Hospitalists is that they are all individuals of color and are all foreign nationals.  Essentially, if a physician is Caucasian and/or their national origin is that of the United States, they are treated differently, and more favorably, than their minority co-workers at Martinsville Memorial.

63. To be clear, Dr. Ofoche is not alleging that his H1-B visa or immigration status was the root of the discrimination and retaliation he experienced.   Rather, his immigration status was the "tool" or "stick" used by Defendants to chain the Hospitalists into a working arrangement that parallels the distasteful former practice of indentured servitude.

64. Dr. Ofoche can also point to a discrete Caucasian comparator whom he directly

16

observed was treated differently, and more favorably, than Dr. Ofoche and other minority/foreign national Hospitalists.  Dr. James Isernia, who, upon information and belief, identifies his race as Caucasian and his national origin as that of the United States, at all times relevant, was employed directly by Martinsville Memorial as a Hospitalist.

65. Unlike the jointly employed Hospitalists, Dr. Isernia appeared to be given preferential treatment with regard to his work schedule.  As an example, if Dr. Isernia was scheduled to begin his shift at 6:00AM, he would regularly arrive at 8:00AM.  Dr. Ofoche also observed Dr. Isernia to leave his shift early on many occasions.   This negatively contributed to the other jointly employed Hospitalists' workloads.

66. Upon information and belief, Dr. Isernia was never disciplined or counseled for the fact that he did not adequately cover his shifts or his patients.

67. Additionally, Dr. Isernia was not held to the grueling work hours, reduced staffing, and high patient load that the jointly employed Hospitalists, including Dr. Ofoche, were required to handle.

68. As a specific example of Dr. Isernia's favorable treatment, on or around December 8, 2016, Dr. Isernia was scheduled to be on duty.  One of his patients became very ill and needed immediate attention.  Even though Dr. Isernia was scheduled to work, he was not available for some unknown reason.  On that same day, Dr. Ofoche started his shift with the heaviest patient load of any physician in the hospital, as well as being tasked with the care of a particularly unstable patient who needed constant medical attention.  Even so, Martinsville Memorial staff consistently paged Dr. Ofoche

17

to cover Dr. Isernia's patient.  Dr. Ofoche requested that Dr. Isernia or another physician be paged to handle Dr. Isernia's patient, but Martinsville Memorial refused and, instead, notified Dr. Gomez and requested that Dr. Ofoche be disciplined.  Dr. Gomez complied and verbally counseled/disciplined Dr. Ofoche for apparently not being able to be in two places at once.   Similar incidents of disparate treatment occurred repeatedly during the course of Dr. Ofoche's employment with Defendants. Upon information and belief, Dr. Isernia was never counseled or disciplined for his abandonment of a patient on this, or any other, occasion.

### Dr. Ofoche's Immigration Status Specifically Threatened as Immigration Status Was a Proxy For Race and National Origin Discrimination/Retaliation

69. This patient care issue intensified for Dr. Ofoche on or about June 20, 2017.  On that date, Dr. Ofoche was, as per the usual, the sole Hospitalist on the night shift.  He was responsible for fifty (50) currently admitted patients located throughout the Martinsville Memorial facility, thirteen (13) newly admitted patients to Martinsville Memorial, all consultations from the ER, as well as the sixteen (16) bed ICU. Additionally, the ICU, which was not staffed with any Intensivist support staff on the night shift, had admitted one patient in critical condition who required almost constant care.

70. That night, Dr. Ofoche was extremely concerned about the large number of patients for which he was solely responsible and was rightfully worried about patient safety. Dr. Ofoche was also upset that non-minority physicians and/or physicians whose national origin was that of the United States were not expected to work in this

dangerous and untenable work environment.

71. In the midst of attempting to provide sufficient care to all of these patients, Dr. Ofoche received a request to accept the transfer of a new patient from a hospital in Danville, Virginia.

72. Accordingly, Dr. Ofoche contacted a nursing supervisor to notify the on-call Hospital Administrator, Mr. BeMent, that he would be unable to accept this new patient unless Defendants provided additional physician support.

73. Ultimately, Dr. Ofoche, Mr. BeMent, and the physician responsible for the ER that shift agreed that the ER would accept and take responsibility for this patient until another Hospitalist became available at 6:00AM.

74. Mr. BeMent immediately complained to Apogee that this "looks like a big hole and barrier to the admission process at night and needs to be addressed by Apogee". However, Apogee did not remedy the situation.  Rather, Apogee conspired against Dr. Ofoche.

75. Even though Dr. Ofoche handled a difficult situation professionally and reasonably, the next day, on or about June 21, 2017, Dr. Ofoche was, again, berated for raising concerns about patient safety and his working environment.

76. Five days later, on or about June 26, 2017, Dr. Gomez made several veiled threats or warnings to Dr. Ofoche concerning Dr. Ofoche's accent and immigration status (again, a thinly veiled reference to his national origin).

77. Specifically, during this exchange, Dr. Gomez was clearly agitated and advised Dr. Ofoche that Dr. Ofoche needed to communicate more clearly. Upon information

19

and belief, Dr. Gomez was suggesting that Dr. Ofoche does not speak English properly because of his Nigerian accent.  Again, upon information and belief, Dr. Gomez was receiving direction from his superiors at Apogee and was bound to comply due to fears related to his H1-B visa employment status.

78. Dr. Ofoche calmly communicated to Dr. Gomez that his [Dr. Ofoche's] English-speaking skills were excellent and that he [Dr. Ofoche] was not inferior for having Nigerian heritage.  Dr. Ofoche also complained that the Hospitalists, all of whom were minorities and foreign nationals, continued to be treated poorly.  Dr. Ofoche shared that non-minority physicians and/or physicians whose national origin was that of the United States were not expected to work in this dangerous and untenable working environment.  Accordingly, Dr. Ofoche clearly and succinctly complained about his treatment based upon his race and national origin.  The verbal exchange terminated at that time.

## Additional Retaliation Against Dr. Ofoche

79. Also on June 26, 2017, Dr. Ofoche was unfairly disciplined when Dr. Gomez advised Dr. Ofoche that Apogee had a written list of performance related "concerns." Dr. Ofoche was not provided with a copy of this list to retain nor did Dr. Gomez walk through the entirety of the list.  Upon information and belief, these performance issues had no basis in fact and were solely created by Apogee, with the help of Martinsville Memorial, as a retaliatory tool.  Supporting this contention is the fact that Dr. Ofoche had never before received any sort of counseling or disciplinary action.

80. During this meeting, Dr. Gomez made a clear reference to Dr. Ofoche's H-1B

visa status and mentioned the tenuous manner of these types of visas.  Dr. Gomez also pointed out that Dr. Ofoche's H1-B visa status was a part of the written list of performance related "concerns".  Based upon Dr. Gomez's tone of voice and pointed irrelevant reference, Dr. Ofoche interpreted this comment as a threat that Apogee and/or Martinsville Memorial planned to jeopardize Dr. Ofoche's H-1B visa status.

81. Dr. Ofoche relayed to Dr. Gomez that the disciplinary action had no basis in fact and requested that it be rescinded.  This request was declined.

82. Dr. Ofoche immediately advised that he planned to seek legal counsel based upon this clear retaliation related to his race and national origin.  Accordingly, Dr. Ofoche clearly and succinctly complained, again, about his treatment based upon his race and national origin.

83. On or about June 28, 2017, Dr. Gomez emailed Dr. Ofoche, wherein he criticized Dr. Ofoche's judgment and communication skills.  Upon information and belief, Dr. Gomez's reference to Dr. Ofoche's "communication" skills was another discriminatory critique of Dr. Ofoche's accent and Nigerian heritage.

### Dr. Ofoche Files Charge of Discrimination with the EEOC

84. In or around August of 2017, Dr. Ofoche filed a Charge of Discrimination with the EEOC alleging race and national origin discrimination and retaliation, and naming Apogee and Martinsville Memorial as his employers.

85. Under EEOC regulations, the EEOC is required to notify Apogee and Martinsville Memorial within ten (10) days of receipt of Dr. Ofoche's EEOC Charge. *See, e.g.*, 29 C.F.R. § 1626.11.

86. On or about October 2, 2017, Apogee filed a Position Statement with the EEOC, clearly indicating that Apogee was aware of Dr. Ofoche's EEOC Charge.   Upon information and belief, Apogee also informed Martinsville Memorial of Dr. Ofoche's EEOC charge. Dr. Ofoche is unaware of the existence of any Position Statement filed by Martinsville Memorial.

87. Unfortunately for Dr. Ofoche, the workplace discrimination and retaliation continued, if not increased, subsequent to his EEOC filing.

88. During the pendency of the EEOC's investigation, and after the EEOC issued a Notice of Right to Sue, Dr. Ofoche was ostracized by his peers, supervisors, and staff, and threatened with termination from employment, all of which caused Dr. Ofoche extreme anxiety and emotional distress, due to concerns of Defendants derailing his immigration status and causing his deportation.

89. Dr. Ofoche also requested during this time period that the unwarranted disciplinary action he received in June of 2017 be rescinded.  Defendants again refused.

90. During this time period, Dr. Ofoche experienced an increase in his tenuous and dangerous working environment and experienced several situations wherein he legitimately suspected that Apogee and Martinsville Memorial were setting him up for failure related to patient care.

91. As a discrete example, Dr. Ofoche experienced numerous occasions where patients who were critical were admitted from the ER to his care in the ICU with no intravenous access for medication administration, and those patients came very close to death due to delayed medication administration.   It was the ER physician's duty to

ensure that the patient has adequate IV access before leaving the ER. Hospitalists such as Dr. Ofoche did not have privileges to place central lines so he was often at the mercy of the Martinsville Memorial employed ER physicians. Despite the threats against him, Dr. Ofoche continued to advocate for patient safety and complain about his treatment.

92. As a discrete example, on or around October 24, 2017, Dr. Ofoche was treating a patient who, ultimately, he diagnosed with sepsis and shock. Dr. Ofoche determined that the patient needed to be transferred to the ICU; however, he was required to contact the on-call Martinsville Memorial Administrator/Chief Financial Officer, Mr. BeMent, for permission. Mr. BeMent initially refused Dr. Ofoche's request despite the patient's dire situation. After 45 minutes of arguing with Mr. BeMent, and Dr. Ofoche involving the ER charge nurse, Mr. BeMent finally relented and the patient was transferred to the ICU. This delay made the difficult job of caring for this patient almost impossible. While the patient ultimately improved, the patient stayed in the ICU for longer than necessary. Upon information and belief, Mr. BeMent's refusal to authorize the patient's transfer to the ICU was directly related to a retaliatory motive against Dr. Ofoche and was an effort to cause him to commit malpractice.

93. As another example, Dr. Ofoche experienced a consistent further decrease in staffing subsequent to the filing of his EEOC charge. This directly and negatively affected his ability to provide safe patient care. Again, Dr. Ofoche was vocal about this practice and the concerning effects it had on his practice and patients' safety.

94. On November 1, 2017, the EEOC issued to Dr. Ofoche a Notice of Right to Sue, concluding its investigation.

95. In an effort to avoid additional discrimination and retaliation and improve his work environment, Dr. Ofoche began exploring employment elsewhere.

96. However, in an additional act of retaliation, Apogee attempted to derail Dr. Ofoche's attempts to obtain new employment.  In December of 2017, within the context of receiving a request for verification of the employment of Dr. Ofoche by Peninsula Regional Medical Center related to another job, Apogee initially refused to cooperate. In addition, Apogee again notified/threatened Dr. Ofoche that he was in jeopardy of losing his H1-B visa.  Upon information and belief, Apogee also took steps to attempt to negatively affect Dr. Ofoche's visa status.

### Dr. Ofoche Constructively Discharged from Employment

97. Dr. Ofoche's working environment remained untenable and unsafe, and resulted in Dr. Ofoche's constructive discharge from employment on or around January 5, 2018.  Dr. Ofoche's last physical day of employment was on or around January 22, 2018.

98. A short temporal proximity of approximately two (2) months elapsed between the conclusion of the EEOC's investigation, in which Dr. Ofoche actively participated, and Dr. Ofoche's constructive discharge from employment.

99. The short temporal proximity between the multiple times Dr. Ofoche complained of discrimination and the following non-exhaustive retaliatory acts/adverse employment actions support multiple violations of federal law: (1) Dr. Ofoche's receipt of unwarranted counseling and written disciplinary actions; (2) the continued denial of a safe and healthy working environment; and (3) Dr. Ofoche's

24

constructive discharge from employment.

100.     Defendants fostered an environment of intimidation and discrimination against Dr. Ofoche and other minority and foreign national employees and Dr. Ofoche would not have been discriminated and retaliated against, and, ultimately, constructively discharged from his employment but for Defendants' discriminatory animus towards Dr. Ofoche's race and national origin.

## V. COUNTS

### COUNT I:  CLAIM FOR TITLE VII RACE DISCRIMINATION

101.     Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

102.     Dr. Ofoche identifies his race as African/Black.

103.     At all times material hereto, Defendants had an obligation to maintain a work environment that was not charged with racial discrimination and hostile to Dr. Ofoche and other minority and foreign national employees.

104.     Defendants violated federal law by creating and permitting a work environment to exist that was discriminatory and hostile to Dr. Ofoche and other minority and foreign national employees based on their racial identity, and by wrongfully disciplining and constructively discharging Dr. Ofoche.

105.     Dr. Kazmi, Dr. Gomez, and others were acting in the course and scope of their employment with Defendants at the time of their actions; therefore, Defendants are liable for their actions under the doctrine of *respondeat superior*.  Their actions against Dr. Ofoche were committed during working hours and at their place of

employment and/or were in conjunction with work-related responsibilities.

106.     As a direct and proximate result of Defendants' actions, Dr. Ofoche has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

107.     At all times material hereto, Defendants engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Dr. Ofoche so as to support an award of liquidated and/or punitive damages.

108.     Prior to Dr. Ofoche's wrongful discipline and constructive discharge, Dr. Ofoche was performing his work at a satisfactory level and meeting or exceeding Defendants' legitimate business expectations.

109.     Any reasons cited by Defendants for Dr. Ofoche's discipline were pretextual as Dr. Ofoche's work performance was meeting legitimate business expectations.

110.     The above-described acts by Defendants constitute race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*

111.     Dr. Ofoche is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

### **COUNT II:  CLAIM FOR TITLE VII RACE RETALIATON**

112.     Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

113.     Dr. Ofoche identifies his race as African/Black.

114.     At all times material hereto, Defendants had an obligation to maintain a

26

work environment that was not charged with racial discrimination and retaliation, and hostile to Dr. Ofoche and other minority and foreign national employees.

115.     Defendants violated federal law by permitting a work environment to exist that was discriminatory, hostile, and offensive to Dr. Ofoche and other minority and foreign national employees, and that punished, retaliated against, and prejudiced a victim of a discriminatory work environment for complaining of the same.

116.     Dr. Ofoche experienced discrimination based upon his race, African/Black.

117.     Dr. Ofoche engaged in the protected activity of complaining about this discriminatory work environment and was subsequently targeted and unfairly disciplined, which ultimately resulted in his constructive discharge from employment.

118.     Dr. Ofoche was unfairly disciplined and constructively discharged from employment in direct retaliation for his complaints about workplace discrimination.

119.     Dr. Kazmi, Dr. Gomez, and others were acting in the course and scope of their employment with Defendants at the time of their actions; therefore, Defendants are liable for their actions under the doctrine of *respondeat superior*.  Their actions against Dr. Ofoche were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

120.     Prior to Dr. Ofoche's wrongful discipline and constructive discharge, he was performing his work at a satisfactory level and meeting or exceeding Defendants' legitimate business expectations.

121.     Any reasons cited by Defendants for Dr. Ofoche's discipline were

pretextual as Dr. Ofoche's work performance was meeting Defendants' legitimate business expectations.

122.    As a direct and proximate result of Defendants' actions, Dr. Ofoche has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

123.    At all times material hereto, Defendants engaged in retaliatory practices with malice or reckless indifference to the federally protected rights of Dr. Ofoche so as to support an award of liquidated and/or punitive damages.

124.    The above-described acts by Defendants constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

125.    Dr. Ofoche is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT III:  CLAIM FOR TITLE VII NATIONAL ORIGIN DISCRIMINATION

126.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

127.    Dr. Ofoche identifies his national origin as Nigerian.

128.    At all times material hereto, Defendants had an obligation to maintain a work environment that was not charged with national origin discrimination and hostile to Dr. Ofoche and other minority and foreign national employees.

129.    Defendants violated federal law by creating and permitting a work environment to exist that was discriminatory and hostile to Dr. Ofoche and other

minority and foreign national employees, and by wrongfully disciplining and constructively discharging Dr. Ofoche.

130.     Dr. Kazmi, Dr. Gomez, and others were acting in the course and scope of their employment with Defendants at the time of their actions; therefore, Defendants are liable for their actions under the doctrine of *respondeat superior*. Their actions against Dr. Ofoche were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

131.     As a direct and proximate result of Defendants' actions, Dr. Ofoche has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

132.     At all times material hereto, Defendants engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Dr. Ofoche so as to support an award of liquidated and/or punitive damages.

133.     Prior to Dr. Ofoche's wrongful discipline and constructive discharge, Dr. Ofoche was performing his work at a satisfactory level and meeting or exceeding Defendants' legitimate business expectations.

134.     Any reasons cited by Defendants for Dr. Ofoche's discipline were pretextual as Dr. Ofoche's work performance was meeting legitimate business expectations.

135.     The above-described acts by Defendants constitute national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*

136.     Dr. Ofoche is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT IV:  CLAIM FOR TITLE VII NATIONAL ORIGIN RETALIATION

137.     Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

138.     Dr. Ofoche identifies his national origin as Nigerian.

139.     At all times material hereto, Defendants had an obligation to maintain a work environment that was not charged with racial discrimination and retaliation, and hostile to Dr. Ofoche and other minority and foreign national employees.

140.     Defendants violated federal law by permitting a work environment to exist that was discriminatory, hostile, and offensive to Dr. Ofoche and other minority and foreign national employees, and that punished, retaliated against, and prejudiced a victim of a discriminatory work environment for complaining of the same.

141.     Dr. Ofoche experienced discrimination based upon his national origin, Nigerian.

142.     Dr. Ofoche engaged in the protected activity of complaining about this discriminatory work environment and was subsequently targeted and unfairly disciplined, which ultimately resulted in his constructive discharge from employment.

143.     Dr. Ofoche was unfairly disciplined and constructively discharged from employment in direct retaliation for his complaints about workplace discrimination.

144.     Dr. Kazmi, Dr. Gomez, and others were acting in the course and scope of their employment with Defendants at the time of their actions; therefore, Defendants

are liable for their actions under the doctrine of *respondeat superior*. Their actions against Dr. Ofoche were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

145.    Prior to Dr. Ofoche's wrongful discipline and constructive discharge, Dr. Ofoche was performing his work at a satisfactory level and meeting or exceeding Defendants' legitimate business expectations.

146.    Any reasons cited by Defendants for Dr. Ofoche's discipline were pretextual as Dr. Ofoche's work performance was meeting Defendants' legitimate business expectations.

147.    As a direct and proximate result of Defendants' actions, Dr. Ofoche has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

148.    At all times material hereto, Defendants engaged in retaliatory practices with malice or reckless indifference to the federally protected rights of Dr. Ofoche so as to support an award of liquidated and/or punitive damages.

149.    The above-described acts by Defendants constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*

150.    Dr. Ofoche is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT V: TITLE VII HOSTILE WORK ENVIRONMENT

151.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

152.     Dr. Ofoche identifies his race as African/Black and is protected from race discrimination and a hostile work environment by Title VII.

153.     At all times material hereto, Defendants had an obligation to maintain a work environment that was not charged with racial discrimination and hostile to Dr. Ofoche and other minority and foreign national employees.

154.     Defendants violated federal law by creating and permitting a work environment to exist that was discriminatory, hostile, and offensive to Dr. Ofoche.

155.     Defendants' discriminatory and retaliatory conduct was unwelcome, unlawful, and based on Dr. Ofoche's race, as evinced by the disparate treatment he received during his employment with Defendants.

156.     The conduct was sufficiently severe and pervasive so as to alter the conditions of Dr. Ofoche's employment and to create an abusive atmosphere. Indeed, Dr. Ofoche was unlawfully disciplined and constructively discharged due to Defendants' racially discriminatory, retaliatory, and hostile conduct.

157.     Dr. Kazmi, Dr. Gomez, and others were acting in the course and scope of their employment with Defendants at the time of their actions; therefore, Defendants are liable for their actions under the doctrine of *respondeat superior*. Their actions against Dr. Ofoche were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

158.     As a direct and proximate result of Defendants' actions, Dr. Ofoche has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

159.     At all times material hereto, Defendants engaged in a practice or practices supporting a hostile work environment with malice or reckless indifference to the federally protected rights of Dr. Ofoche so as to support an award of liquidated and/or punitive damages.

160.     The above-described acts by Defendants constitute the creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, as codified under 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

161.     Dr. Ofoche is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT VI:  CLAIM FOR § 1981 RACE DISCRIMINATION

162.     Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

163.     Dr. Ofoche identifies his race as African/Black and is protected from race discrimination by Section 1981.

164.     At all times material hereto, Defendants had an obligation to maintain a work environment that was not charged with racial discrimination and hostile to Dr. Ofoche and other minority and foreign national employees.

165.     Defendants violated federal law by creating and permitting a work environment to exist that was discriminatory and hostile to Dr. Ofoche and other minority and foreign national employees, and by wrongfully disciplining and constructively discharging Dr. Ofoche.

33

166.     Dr. Kazmi, Dr. Gomez, and others were acting in the course and scope of their employment with Defendants at the time of their actions; therefore, Defendants are liable for their actions under the doctrine of *respondeat superior*.  Their actions against Dr. Ofoche were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

167.     As a direct and proximate result of Defendants' actions, Dr. Ofoche has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

168.     At all times material hereto, Defendants engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Dr. Ofoche so as to support an award of liquidated and/or punitive damages.

169.     Prior to Dr. Ofoche's wrongful discipline and constructive discharge, Dr. Ofoche was performing his work at a satisfactory level and meeting or exceeding Defendants' legitimate business expectations.

170.     Any reasons cited by Defendants for Dr. Ofoche's discipline were pretextual, as Dr. Ofoche's work performance was meeting legitimate business expectations.

171.     The above-described acts by Defendants constitute race discrimination in violation of the Civil Rights Act of 1991, as amended, 42 U.S.C. § 1981, *et seq*.

172.     Dr. Ofoche is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 1988(b).

34

## COUNT VII:  CLAIM FOR § 1981 RACE RETALIATON

173.     Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

174.     Dr. Ofoche identifies his race as African/Black and is protected from race discrimination and retaliation by Section 1981.

175.     At all times material hereto, Defendants had an obligation to maintain a work environment that was not charged with racial discrimination and retaliation, and hostile to Dr. Ofoche and other minority and foreign national employees.

176.     Defendants violated federal law by permitting a work environment to exist that was discriminatory, hostile, and offensive to Dr. Ofoche and other minority and foreign national employees, and that punished, retaliated against, and prejudiced a victim of a discriminatory work environment for complaining of the same.

177.     Dr. Ofoche experienced discrimination based upon his race, African/Black.

178.     Dr. Ofoche engaged in the protected activity of complaining about this discriminatory work environment and was subsequently targeted and unfairly disciplined, which ultimately resulted in his constructive discharge from employment.

179.     Dr. Ofoche was unfairly disciplined and constructively discharged from employment in direct retaliation for his complaints about workplace discrimination.

180.     Dr. Kazmi, Dr. Gomez, and others were acting in the course and scope of their employment with Defendants at the time of their actions; therefore, Defendants are liable for their actions under the doctrine of *respondeat superior*.  Their actions

35

against Dr. Ofoche were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

181.    Prior to Dr. Ofoche's wrongful discipline and constructive discharge, Dr. Ofoche was performing his work at a satisfactory level and meeting or exceeding Defendants' legitimate business expectations.

182.    Any reasons cited by Defendants for Dr. Ofoche's discipline were pretextual as Dr. Ofoche's work performance was meeting legitimate business expectations.

183.    As a direct and proximate result of Defendants' actions, Dr. Ofoche has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

184.    At all times material hereto, Defendants engaged in retaliatory practices with malice or reckless indifference to the federally protected rights of Dr. Ofoche so as to support an award of liquidated and/or punitive damages.

185.    The above-described acts by Defendants constitute retaliation in violation of the Civil Rights Act of 1991, as amended, 42 U.S.C. § 1981, *et seq*.

186.    Dr. Ofoche is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 1988(b).

## COUNT VIII: §1981 HOSTILE WORK ENVIRONMENT

187.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

188.    Dr. Ofoche identifies his race as African/Black and is protected from race

discrimination and a hostile work environment by Section 1981.

189.    At all times material hereto, Defendants had an obligation to maintain a work environment that was not charged with racial discrimination and hostile to Dr. Ofoche and other minority and foreign national employees.

190.    Defendants violated federal law by creating and permitting a work environment to exist that was discriminatory, hostile, and offensive to Dr. Ofoche.

191.    Defendants' discriminatory and retaliatory conduct was unwelcome, unlawful, and based on Dr. Ofoche's race, as evinced by the disparate treatment he received during his employment with Defendants.

192.    The conduct was sufficiently severe and pervasive so as to alter the conditions of Dr. Ofoche's employment and to create an abusive atmosphere. Indeed, Dr. Ofoche was unlawfully disciplined and constructively discharged due to Defendants' racially discriminatory, retaliatory, and hostile conduct.

193.    Dr. Kazmi, Dr. Gomez, and others were acting in the course and scope of their employment with Defendants at the time of their actions; therefore, Defendants are liable for their actions under the doctrine of *respondeat superior*. Their actions against Dr. Ofoche were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

194.    As a direct and proximate result of Defendants' actions, Dr. Ofoche has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

195.    At all times material hereto, Defendants engaged in a practice or

practices supporting a hostile work environment with malice or reckless indifference to the federally protected rights of Dr. Ofoche so as to support an award of liquidated and/or punitive damages.

196.     The above-described acts by Defendants constitute the creation of a hostile work environment in violation of the Civil Rights Act of 1991, as amended, 42 U.S.C. § 1981, *et seq*. ("Section 1981").

197.     Dr. Ofoche is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 1988(b).


WHEREFORE, Plaintiff Chijioke Kingsley Ofoche, MD, prays for judgment against Defendant Apogee Medical Group, Virginia, P.C., and Defendant PHC-Martinsville, Inc. d/b/a Sovah Health Martinsville (Martinsville CI) d/b/a Memorial Hospital of Martinsville and Henry County, for equitable relief, compensatory, liquidated and/or punitive damages, together with prejudgment interest from the date of termination of Plaintiff's employment, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.


TRIAL BY JURY IS DEMANDED.

Respectfully submitted,

/s/ Thomas E. Strelka
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
STRELKA LAW OFFICE, PC
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA  24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com

*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 4th day of October, 2018, the foregoing was sent to the following attorneys for the Defendants via the Court's electronic CM/ECF system:

Mary Elizabeth Davis, Esq.
LeClair Ryan PLLC
919 East Main Street
Twenty-Fourth Floor
Richmond, VA 23219
Betsy.davis@leclairryan.com

*Counsel for Defendant Apogee Medical Group, Virginia, P.C.*

Steven D. Brown, Esq.
ISLER DARE, P.C.
411 East Franklin Street, Suite 203
Richmond, VA 23219
Tel: 804-489-5500
Fax: 804-234-8234
sbrown@islerdare.com

Mark W. Peters, Esq.
Katherine C. Heard, Esq.
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Tel: 615-244-6380
Fax: 614-244-6804
mark.peters@wallerlaw.com
coe.heard@wallerlaw.com

*Counsel for Defendant PHC-Martinsville, Inc.*
*d/b/a Memorial Hospital of Martinsville & Henry County*

*/s/Thomas E. Strelka*

40